UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PAMELA J. BIAGAS )<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>)<br>DISTRICT OF COLUMBIA )<br>)<br>)<br>Defendant. ) | Civil Action No. 01-2578 (RJL) |

MEMORANDUM OPINION
(January 25, 2010) [# 52]

Pamela Biagas is suing her former employer, the District of Columbia, for employment discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"). The case is now before the Court on the District's renewed Motion for Summary Judgment. After careful consideration of the parties' pleadings, applicable law, and the entire record herein, the District's Motion is GRANTED.

## BACKGROUND

This case arises out of Biagas's work for the District through its Child and Family Services Agency ("the Agency"). Starting in August 1996, Biagas was employed as a social worker for the Agency, where her primary responsibility was to assist neglected or abused children. (Biagas Dep. at 8, 27-28.[1]) Part of Biagas's job required her to make

---

[1] Portions of the Biagas deposition are appended to defendant's renewed Motion for Summary Judgment [# 52] and plaintiff's Opposition to that motion [# 54]. The entire deposition transcript is appended to defendant's prior Motion for Summary Judgment [# 24].

1

house calls to investigate claims of neglect or abuse; in rare cases of emergency, she was required to physically remove children from imminently dangerous surroundings. (*Id.* at 27-28.)

In 1998, after two years on the job, Biagas underwent the first of several surgeries she would receive to address underlying health issues including obesity, hypertension, congestive heart failure, and diabetes. (*Id.* at 12-14.) She underwent a gastric bypass in December of that year and returned to work sometime in early 1999 after her recovery. (*Id.* at 13-14.) Roughly a year later, in March 2000, Biagas checked back into the hospital for bladder surgery and a hysterectomy. (*Id.* at 18-19.) After six weeks of recovery from this second set of procedures, before returning to work, Biagas underwent a third operation. This time, she received an abdominoplasty to remedy some cosmetic consequences of her earlier gastric bypass. (*Id.* at 19.) All told, Biagas took off the first half of 2000 due to her second and third surgeries and did not return to work until June or July of that year. (*Id.* at 18-19.)

When Biagas did return, she told her supervisors that she could not lift any heavy objects lest she risk reversing her bladder surgery. (*Id.* at 20-21, 29.) She did not request a different job at this point, however. (*Id.* at 29.) It appears Biagas did not make such a request because her position generally did not require her to lift heavy objects; social workers were usually accompanied by assistants whose specific purpose was to offer physical support in the field. (*Id.* at 28, 30.)

Several months after her return, however, Biagas encountered an emergency which required her to carry two infants without the aid of an assistant from her car, which was parked in front of the Agency, to a room on the first floor of the Agency. (*Id.* at 34-36.) While this episode does not appear to have caused Biagas any physical harm, it upset her because she had told her supervisors that she was restricted from lifting anything over ten pounds. (Pl.'s Opp'n Ex. 1 ("Biagas Aff.") ¶ 9-10.) Biagas again encountered an emergency situation one month later which resulted in her lifting two infant children without assistance. (Biagas Dep. at 38-44.) This second incident particularly angered Biagas because she contends there was an assistant available to help her that night, but that her supervisor prevented the assistant from accompanying Biagas. (*Id.* at 39-40.)

It appears that these two emergencies were isolated incidents, because in general and in the month in between the two incidents, Biagas was in fact accompanied by an assistant while out in the field. (*Id.* 37-38.) In any event, several weeks after the second incident, Biagas claims she began to suffer health problems which she attributes to the unassisted lifting she did on those two emergency visits. (*Id.* at 44-55.) According to Biagas, her doctor told her that these incidents caused her bladder surgery to reverse itself. (*Id.* at 55.) Three years later, in 2003, Biagas went in for a second bladder surgery. (*Id.* at 56.) Biagas now claims that her lifting restriction, originally prescribed at twenty pounds and later ten pounds, has been reduced to five pounds. (Biagas Aff. ¶ 4.)

Although Biagas finished out her shift the night of the second incident, she refused to return to work afterwards. (Biagas Dep. at 44-45, 50-51.) Based on her belief that she could no longer work for the supervisor who she claims refused her the aid of an assistant, and her belief that she could no longer work in the field despite the general availability of assistants, Biagas told the Agency in December 2000 that she could not continue work unless placed in a light duty position. (*Id.* at 52-53.) Specifically, Biagas requested work on the Agency's telephone hotline which would not require her to go out into the field at all. (*Id.*)

There were no available hotline positions, however, and the Agency informed Biagas in April 2001 that her four month absence from work was unfairly burdening her co-workers. (Def. Mot. Ex. B.) Biagas was told to return to work within three weeks or risk losing her job. (*Id.*) Biagas refused this instruction, and instead, she filed complaints with the Equal Employment Opportunity Commission and the D.C. Department of Human Rights. (Pl.'s Facts ¶ 17.) Shortly thereafter, in June 2001, the Agency offered Biagas a newly available hotline position like the one she had requested earlier. (Biagas Dep. at 60-61.) It appears Biagas was told that she could begin work on the hotline on August 10, 2001, but she declined this position through her lawyer because she never received confirmation of the offer in writing. (Def. Mot. Ex. E.) Specifically, Biagas's lawyer wrote to the Agency, "[s]ince more than a month has passed since Ms. Biagas expected to have begun work and she has yet to receive confirmation of your offer of

employment, she has determined that re-employment . . . will not be in her best interest." (*Id.*)

Biagas then filed this lawsuit in December 2001, claiming that the District violated the ADA by denying her reasonable accommodations for her lifting disability. The Court denied defendant's first Motion for Summary Judgment in February 2006. Since that time, the parties have engaged in additional discovery and the case is now back before the Court on defendant's Renewed Motion for Summary Judgment. Biagas, of course, opposes the renewed Motion. For the following reasons, Biagas's opposition falls short of the legal standard for surviving summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When considering whether genuine issues of material fact exist, the Court must draw all justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). To survive a motion for summary judgment, the non-moving party must oppose the motion with more than the "mere existence of a scintilla of evidence." *Id.* at 252. "If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50

(citations omitted). In sum, the non-movant must offer "evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252.

## ANALYSIS

Under the version of the ADA applicable to this case, a plaintiff is considered to have a "disability" if she suffers from "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," if she had a "record of such impairment," or if she has been "regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C) (1990).[2] Biagas claims she satisfies the first prong of the statute's "disability" definition because she had "a physical impairment that substantially limits her in the major life activity of performing manual tasks which includes lifting of more than five (5) pounds." (Pl.'s Opp'n at 9.) The District challenges Biagas's claim on the grounds that she was not in fact "disabled" and therefore not subject to the ADA's protection. Based on the facts in the record and the law in this jurisdiction, Biagas's claim must fail.

First, Biagas has simply failed to produce evidence sufficient to establish that her lifting restriction was as severe as she claims it was. That Biagas had some limitation is not in dispute – the District, in its Motion for Summary Judgment, concedes that Biagas's physician "advised against her performing any heavy lifting." (Def.'s Facts ¶ 3.) The

---

[2] While Congress recently amended the ADA to broaden the definition of "disability," neither party argued that the amended definition should apply here. In any event, this Court has held that the ADA amendments do not apply retroactively, so whether Biagas would qualify as "disabled" under the amended ADA is not at issue here, where the conduct in question occurred long before the 2008 amendments. *See DuBerry v. District of Columbia*, 582 F. Supp. 2d 27, 30 n.1 (D.D.C. 2008).

District notes, however, that "[n]onetheless, [Biagas] was able to bathe herself, dry herself following bathing, reach for objects, and do laundry and grocery shopping with assistance." (Def.'s Facts ¶ 4.) According to Biagas, her condition was far more severe. She adds that in addition to being advised against heavy lifting, she could not "lift weights at the gymnasium, move furniture or other objects in excess of five (5) pounds." (Pl.'s Facts ¶ 4.)

Biagas has not pointed to any evidence to corroborate her account of her condition, however. The most probative piece of evidence Biagas offers is a copy of the hospital discharge instructions she received after her bladder surgery and hysterectomy in March 2000 – but these instructions say only that Biagas must avoid "heavy lifting or strenuous exercise." (Pl.'s Opp'n Ex. 1 at 8.) Noticeably absent from this document is any mention of what weight Biagas was limited to lifting, and for how long. Biagas also points to a letter written by her doctor in October 2000 which advises her "not to return to work until she can be placed in a light duty position." (Pl.'s Opp'n Ex. 1 at 7.) But this letter is short on specifics as well; rather than specifying the nature and duration of Biagas's lifting restriction, it says only that Biagas "has not recovered 100%" and that "it [is] difficult for her to continue working a night position or working in the capacity in which she was employed, which involved lifting children as well as work in the community or court." (*Id.*) Biagas's bare assertions that her doctors imposed on her a specific and permanent five-pound lifting restriction are simply unsupported by any other evidence in the record and insufficient at this stage of the proceedings. *See, e.g.,*

*Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 195 (D.D.C. 2008) ("Summary judgment for a defendant is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving, conclusory statements.") The weakness of Biagas's self-serving assertions is particularly acute in this case, where she has had more than ample time to conduct discovery and to produce for the Court evidence that might corroborate her claims.

Second, in light of the scant evidence concerning the severity of her condition, no reasonable jury could conclude that Biagas was "substantially" limited in a "major life activity." Biagas does not even contend that her lifting restriction substantially limited her in the major life activity of working. Indeed, she could not, given her request to return to a light duty work position with the Agency and her acknowledgment that lifting was not even required for her specific job except for the isolated instances where an assistant was not available. (Biagas Dep. at 37-38, 52-53.) Rather, Biagas argues that her lifting restriction substantially limited her major life activities of lifting and performing manual tasks. (Pl.'s Opp'n at 12.) I disagree.

Biagas's argument is unpersuasive given the prevailing weight of authority in this District. Indeed, in *Lytes v. District of Columbia Water & Sewer Auth.*, my colleague Judge Collyer held that a five-to-ten-pound lifting restriction was not a "disability" for ADA purposes. *See* 527 F. Supp. 2d 52, 56-61 (D.D.C. 2007). *Lytes* is particularly instructive here, of course, because its facts are so similar. For instance, like Biagas, the *Lytes* plaintiff's disability claim arose out of a series of surgeries intended to correct

medical problems associated with obesity. *Id.* at 54-55. Moreover, like Biagas, the *Lytes* plaintiff refused to return to his old post and instead requested "light duty" work on the advice of his doctor, who cautioned that he should "avoid heavy manual labor and repeated bending, twisting, and lifting." *Id.* at 55. Finally, with evidence even stronger than Biagas's, the *Lytes* plaintiff claimed a restriction severe enough that he could not "bend or lift more than 5 pounds." *Id.* at 55. Nonetheless, Judge Collyer held that "[r]estrictions to sedentary or light duty are insufficient to substantially limit [plaintiff] in a major life activity as the ADA has been interpreted and applied." *Id.* at 61. Accordingly, she found the *Lytes* plaintiff not to be a qualified individual with a disability subject to the ADA's protections. *Id.*

Furthermore, in *Siragy v. Georgetown University*, another colleague, Judge Urbina, held that a seven-pound lifting restriction and a ten-pound restriction for pushing and pulling did not, as a matter of law, amount to a "disability" under the ADA. *See* 1999 WL 767831 at *4 (D.D.C. Aug. 20, 1999). In so holding, *Siragy* noted that numerous cases from other jurisdictions have concluded the same. *See id.* (citing *Williams v. Channel Master Satellite Systems, Inc.*, 101 F.3d 346, 349 (4th Cir. 1996) (finding a twenty-five-pound lifting restriction was not a "disability"), *Coker v. Tampa Port Authority*, 962 F. Supp. 1462, 1468 (M.D. Fla. 1997) (finding a lifting restriction not to be a "disability"), *Horth v. General Dynamics Land Systems, Inc.*, 960 F. Supp. 873 (finding a restriction against continually lifting more than twenty pounds was not a "disability")).

Given the limited facts which Biagas has presented to oppose summary judgment, and the prevailing interpretation of the 1990 ADA, it is clear that no reasonable jury could find that Biagas was substantially limited in a major life activity and thus protected by the statute.

## CONCLUSION

Accordingly, for all these reasons, the District's Motion for Summary Judgment is GRANTED. An appropriate Order will issue with this Memorandum Opinion.

---
RICHARD J. LEON
United States District Judge